**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

JOYCE GENWRIGHT,

    Plaintiff,

vs.                                                      CASE NO. 3:10-cv-913-J-TEM

MICHAEL J. ASTRUE,
Commissioner of Social Security,

    Defendant.
_____

## ORDER AND OPINION

       This matter is before the Court on Plaintiff's complaint (Doc. #1), seeking review of the final decision of the Commissioner of the Social Security Administration (the Commissioner) denying her claim for disability insurance benefits (DIB).  Plaintiff filed a legal brief in support of the complaint (Doc. #10).  Defendant filed his brief in support of the decision to deny disability benefits (Doc. #12).  Both parties consented to the exercise of jurisdiction by a magistrate judge, and the case has been referred to the undersigned by the Order of Reference dated December 1, 2011 (Doc. #16).  The Commissioner has filed the transcript of the underlying administrative proceedings and evidentiary record.[1]

       Upon review of the record, the Court found the issues raised by Plaintiff were fully briefed and concluded oral argument would not benefit the Court in its making its determinations.  Accordingly, the matter has been decided on the written record.  For the reasons set out herein, the decision is **AFFIRMED.**

---

      [1]Hereafter, the Court will identify the Transcript as "Tr." followed by the appropriate page number.

## FACTS AND MEDICAL HISTORY

Plaintiff, Joyce Genwright, was born in December of 1960 (Tr. 31). Thus, she was forty-eight (48) years old on the date of the ALJ decision. The record establishes that Plaintiff is left-hand dominant and lives with her dependent daughter (Tr. 32). Plaintiff earned an Associate of Arts degree in Criminal Justice and an Associate of Science degree in Paralegal Studies. *Id.* She has past relevant work as a document reviewer, legal clerk, mold machine operator, office clerk, process server, receptionist and substitute teacher (Tr. 45-49, 176).

On May 4, 2005, the initial alleged onset date, Plaintiff was involved in a motor vehicle accident in which she suffered a variety of injuries, including a dislocated left shoulder (Tr. 254). A CT scan taken on the same day as the accident showed "bilateral nasal bone fractures . . .[,] extensive amount of extraluminal air within the deep and superficial soft tissues of the neck . . . [and a] congenital fusion at C4-C6" (Tr. 256-57).

Plaintiff began treatment with Gary Kitay, M.D., of Jacksonville Orthopaedic Institute on July 7, 2005 and continued to see him periodically until July 12, 2006 (Tr. 297-356). A MRI of the left shoulder taken on July 21, 2005 showed post-traumatic changes without evidence of a rotator cuff tear (Tr. 260-61). After reviewing the results of the MRI, Dr. Kitay diagnosed Plaintiff with "[h]istory of left shoulder dislocation with bony Bankart [and] left frozen shoulder in the setting of axillary neuropathy[2]" and suggested a neurolysis of the left shoulder (Tr. 329-30). Plaintiff underwent the neurolysis and manipulation under

---

[2]Axillary neuropathy is defined as a disorder affecting the "nerve that arises from the posterior cord of the brachial plexus in the axilla, passes laterally and posteriorly through the quadrangular space with the posterior circumflex humeral artery." *See* MediLexicon, http://www.medilexicon.com/medicaldictionary.php?t=88261 (last visited February 9, 2012).

anaesthesia in January 2006 (Tr. 297-300). Plaintiff saw Dr. Bruce Steinberg of the same practice on June 5, 2006, for a second opinion regarding further treatment options (Tr. 305-306). Dr. Steinberg recommended a second surgery, of which there is no record Plaintiff ever underwent.[3]  *Id.*

Plaintiff attended physical therapy to increase her cervical and left shoulder range of motion (ROM) and to reduce pain from May 17, 2005 through July 6, 2005, under the order of Dr. Malozak, D.O.  (Tr. 283-95).  Apparently on Dr. Kitay's recommendation, Plaintiff continued physical therapy from July 7, 2005 until August 31, 2005 (see Tr. 264-82).[4]  While Plaintiff's ROM improved during therapy, Plaintiff reported no relief from her pain.  *See id.*  On June 16, 2006, Dr. Kitay agreed Plaintiff could continue modified work and her prior work status of no overhead use and no lifting more than five pounds with the left arm" would remain in place (Tr. 303-04).  On that date and again on July 12, 2006,  Dr. Kitay found that Plaintiff had reached maximum medical improvement with a partial permanent impairment rating (PPI) of twenty-three percent (23%) (Tr. 302-04).

It should be noted that Plaintiff worked full-time as a receptionist during part of her treatment period  with Dr. Kitay (*see, e.g.*, 309, 316).  Plaintiff made no changes in her duties after Dr. Kitay ordered work restrictions.  *See id.*    Furthermore, Plaintiff admitted to Dr. Kitay that she tolerated the work (Tr. 309)  Presumably because of the substantial gainful activity (SGA) during this time, Plaintiff's counsel and the ALJ discussed amending

---

[3] There is an office note indicating Plaintiff underwent a left shoulder arthroscopy with Dr. Fady El-Bahri in September 2009 (Tr. 483).

[4] From Janury 20, 2006 through March 3, 2006, Dr. Kitay notes that Plaintiff will "continue with her therapy program" (Tr. 315, 318, 320).  However, there are no corresponding records from a physical therapy facility during this period.

the alleged onset date of the disability from the date of the accident to March 1, 2007, the date Plaintiff last worked at her receptionist job (Tr. 53-54)[5]. While the ALJ did not definitively rule on the change, his decision reflects the amended date (Tr. 13).

At the request of the Division of Disability Determination (DDS), Plaintiff presented to Lynn Harper-Nimock, M.D. for a consultation on July 16, 2007 (Tr. 358-64). Dr. Harper-Nimock diagnosed Plaintiff with degenerative joint disease of the cervical spine and left shoulder, status post rotator cuff surgery of the left shoulder and obesity (Tr. 360). She found Plaintiff had "moderate limitations for pushing, pulling, overhead lifting, and prolonged standing" (Tr. 360). Medical Consultant Sondra Waugaman filled out a Physical Residual Functional Capacity Assessment form on July 19, 2007, and "limited [Plaintiff's] lifting, carrying, pushing, and pulling to 20/10 lbs. and walking and standing to 6 hours" (Tr. 372).

The record shows Plaintiff next treated with Jorge Caballero, D.O., at the Family Medical Center from August 29, 2007 to February 12, 2009 (Tr. 436-61, 479-82). During this time, Plaintiff complained of left shoulder pain and limited mobility, depression, anxiety, and irritability. *Id.* On September 24, 2007, Dr. Caballero ordered x-rays of the cervical spine, lumbar spine, left shoulder, and left knee, then diagnosed C4-C6 congenital fusion, lumbar osteophytes, and joint space narrowing in the left knee (Tr. 449-51). Dr. Caballero recommended Plaintiff start another round of physical therapy. *Id.*

A MRI of the left shoulder was taken on January 15, 2008 showed "supraspinatus tendonosis without evidence of rotator cuff tear and no evidence of direct impingement by

---

[5]The Plaintiff testified that she was "let go" from her receptionist job when the Worker's Compensation settlement from her May 2005 accident came through (Tr. 46).

the acromion or acromioclavicular joint" (Tr. 439-40).  It also showed a "blunted and somewhat thin anterior superior labrum, perhaps representing a normal anatomic variant or perhaps an old injury."  *Id.*  On January 31, 2008, Plaintiff returned to Dr. Caballero for a cortizone shot to relieve her left shoulder pain (Tr. 438,480).  In March 2008, Plaintiff presented underwent EMG/NCV[6] testing, which is the most recent test of this type in the record (Tr. 436).  The NCV was within normal limits, and the EMG showed "decreased recruitment but no denervation potentials."  *Id.*

On February 3, 2009, Dr. Caballero wrote a narrative opinion letter to ALJ Droker (Tr. 462-63). Dr. Caballero set forth restrictive work limitations for Plaintiff, including no pushing or pulling, occasional to frequent reaching with the right arm only, no overhead work with either arm, no writing or typing, no lifting with the left arm and lifting only 5-10 pounds occasionally with the right arm.  *Id.*  He further restricted Plaintiff to working at face level only, with "very little flexion/extension or side rotation of the neck" and required that she keep a flexible work schedule to accommodate her frequent need to lie down.  *Id.*

Dr. Caballero referred Plaintiff to Dr. Bahri for an orthopaedic evaluation in February 2009 (Tr. 483).  Dr. Bahri ordered a follow-up MRI of the left shoulder, which showed "marked thinning of the supraspinatus and infraspinatus tendons, consistent with chronic tears" (Tr. 483-85).  Based upon the MRI results, Dr. Bahri recommended surgery (Tr. 483). Plaintiff underwent an arthroscopy of the left shoulder with Fady El-Bahri, M.D., in

---

[6]An EMG/NCV is the combination of an electromyogram, which is a graphic representation of the electric currents associated with muscular action, and nerve conduction velocity test, which measures the rate of impulse conduction in a peripheral nerve or its various component fibers. MediLexicon, http://www.medilexicon.com/medicaldictionary.php?t=88261 (last visited February 9, 2012).

September 2009, but the findings from that surgery are not included in the record (*see* Tr. 488). Plaintiff continued physical therapy and followed up with both Dr. Bahri and Dr. Caballero through the end of September 2009, where the record ends (Tr. 436, 488).

In May 2009, Plaintiff presented to Peter Knox, M.Ed., Psy.D., for a psychiatric consultation (Tr. 465). Dr. Knox diagnosed "major depression, somatization disorder (prominent hypochondriacal features), negativistic disorder, pain issues, [and] living and occupation issues" (Tr. 474). He found a past and current GAF of 50 (Tr. 475).[7] Dr. Knox found Plaintiff had minor limitations in understanding and remembering complex instruction, making judgments on complex work-related decisions, and carrying out complex instructions. *Id.* He also found Plaintiff had moderate limitations in interacting with the public, supervisors and co-workers, and responding appropriately to the usual work situations and changes in a routine work setting (Tr. 476).

## PROCEDURAL HISTORY

Plaintiff protectively filed an application for DIB with the Social Security Administration on May 30, 2007 (Tr. 145-46). Plaintiff initially alleged an onset of disability of May 4, 2005. *Id.* At the administrative hearing, Plaintiff's counsel suggested amending the alleged onset of disability to March 1, 2007 due to Plaintiff's earnings in 2006 and 2007

---

[7]The Global Assessment of Functioning Scale (GAF) was designed by mental health clinicians to rate the psychological, social and occupational functioning of an individual on a mental health scale of 0-100. A GAF score of 41-50 describes "serious symptoms" and includes "serious impairment in the social occupational or school functioning." A GAF score of 51-60 describes "moderate symptoms" and includes on moderate difficulty in functioning. A GAF score of 71-80 indicates that if symptoms are present, they are transient and expectable reactions to psycho-social stressors with no more than slight impairment in social, occupational or school functioning. *See Diagnostic and Statistical Manual of Mental Disorders*, DSM-IV, 27-36 (4th ed., American Psychiatric Assoc. 2000).

(Tr. 53). Plaintiff alleged she was unable to work due to frozen left shoulder with nerve damage, neck stiffness, and a loss of ROM in the left shoulder (Tr. 211-18). The application was denied initially and upon reconsideration. An administrative hearing was held on February 26, 2009, but was continued without testimony to allow Plaintiff to seek a psychiatric evaluation (Tr. 64-65).

The final administrative hearing was held on October 20, 2009, in Jacksonville, Florida, before Administrative Law Judge (ALJ) Robert Droker (Tr. 30-61). Plaintiff appeared and testified at the hearing, as did vocational expert ("VE") Mr. Ted Mitchell (Tr. 30). Plaintiff was represented at the administrative hearing by attorney Lori Gaglione (Tr. 73). The ALJ issued the decision denying Plaintiff's claim for DIB on November 12, 2009 (Tr. 11-22). Plaintiff requested review of the hearing decision by the Appeals Council, but the request was denied (Tr. 1-5). Thus, the ALJ's decision became the final decision of the Commissioner. Thereafter, Plaintiff's current counsel of record, Mr. Erik Berger, Esq., filed the instant complaint in federal court on October 5, 2010 (Doc. #1 at 1).

### SOCIAL SECURITY ACT ELIGIBILITY, THE ALJ DECISION, AND THE STANDARD OF REVIEW

A plaintiff is entitled to disability benefits under the Social Security Act only when he or she is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to either result in death or last for a continuous period of not less than 12 months. 20 C.F.R. § 404.1505.[8] The Commissioner has established a five-step sequential evaluation process for determining

---

[8] All references made to 20 C.F.R. will be to the 2011 edition unless otherwise specified.

whether a plaintiff is disabled and therefore entitled to benefits. *See* 20 C.F.R. § 404.1520(a)(4); *Crayton v. Callahan*, 120 F. 3d 1217, 1219 (11th Cir. 1997). Plaintiff bears the burden of persuasion through step four, while at step five the burden shifts to the Commissioner. *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987).

The ALJ's decision dated November 12, 2009, denied Plaintiff's claim (Tr. 11-22). At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since March 1, 2007 (Tr. 13). ALJ Droker found Plaintiff's date last insured to be June 30, 2011. *Id.* At step two, the ALJ found Plaintiff had the severe impairments of degenerative joint disease of the left shoulder status post surgery, degenerative disc disease of the cervical spine, obesity and affective disorder. *Id.* At step three, the ALJ found these impairments do not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* The ALJ next determined that Plaintiff had the residual functional capacity (RFC) to perform light work, with the additional limitation that she lift only up to ten pounds, and only bend, kneel, crouch, stoop, squat or crawl occasionally (Tr. 15). The ALJ further found Plaintiff should avoid repetitive twisting of her neck, overhead reaching and forward reaching with her left arm, and should work in a low stress environment in which she would have limited contact with the public. *Id.* At step , the ALJ determined that Plaintiff could perform her past relevant work as a receptionist (Tr. 20).

Apparently in an abundance of caution, ALJ Droker proceeded to step five and found Plaintiff alternatively could work as an addresser, taper, bonder (semi-conductor), survey worker or information clerk (Tr. 20-22). Thus, the ALJ determined that Plaintiff is not disabled within the meaning of the Social Security Act (Tr. 22).

8

The scope of this Court's review is generally limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence. *See also Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is defined as more than a scintilla—*i.e.*, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (*citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982)).

Where the Commissioner's decision is supported by substantial evidence, the Court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560.

The Commissioner must apply the correct law and demonstrate that he has done so. While the Court reviews the Commissioner's decision with deference to the factual findings, no such deference is given to the legal conclusions. *Keeton v. Dep't of Health & Human Serv's.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)). Therefore, in determining whether the Commissioner's

9

decision is supported by substantial evidence, the reviewing court must not re-weigh the evidence, but must determine whether the record, as a whole, contains sufficient evidence to permit a reasonable mind to conclude that the plaintiff is not disabled. *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

As in all Social Security disability cases, Plaintiff bears the ultimate burden of proving disability, and is responsible for furnishing or identifying medical and other evidence regarding her impairments. *Bowen*, 482 U.S. at 146 n.5; *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991); *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987); 42 U.S.C. § 423(d)(5) ("[a]n individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require."). It is a plaintiff's burden to provide the relevant medical and other evidence that he or she believes will prove they suffer from disabling physical or mental functional limitations. 20 C.F.R. § 404.704.

## ANALYSIS

Plaintiff raises two issues on appeal. First, Plaintiff argues the ALJ erred by failing to establish "good cause" for his decision to assign "little weight" to the opinion of Dr. Caballero (Doc. #10 at 13-21). Second, Plaintiff argues the ALJ erred by failing to state the weight he accorded to the opinion of Dr. Kitay (Doc. #10 at 21-24).

Defendant counters that the ALJ's decision was supported by substantial evidence (Doc. #12 at 7). Defendant specifically asserts that the opinions of Dr. Caballero are not supported by the record evidence as a whole, thereby establishing the "good cause" necessary to discount the opinion of a treating physician (Doc. #12 at 7-9). Additionally,

Defendant argues that either Dr. Kitay's opinion predates the alleged onset date and therefore it was harmless error to not discuss the opinion, or if Plaintiff did not change her alleged onset date, then she engaged in SGA that negates her disability claim (Doc. #12 at 10-11).  Also with regard to Dr. Kitay, Defendant argues the ALJ's determination of Plaintiff's RFC is not inconsistent with Dr. Kitay's work restrictions  (Doc. #12 at 10).

### A. Good cause to discount Dr. Caballero's opinion

If a treating physician's opinion on the nature and severity of a claimant's impairments is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527(d).  Generally, the more consistent an opinion is with the record as a whole, the more weight it will be given.  See 20 C.F.R. § 404.1527(d)(4).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  See Edwards v. Sullivan, 937 F.2d at 583; see also Bloodsworth, 703 F.2d at 1240.  The United States Court of Appeals for the Eleventh Circuit has concluded "good cause" exists to discount a treating physician's opinion when (1) the opinion is not bolstered by the evidence; (2) the evidence supports a contrary finding; or, (3) the treating physician's opinion is conclusory or inconsistent with his own medical records.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).

In his decision, the ALJ afforded little weight to Dr. Caballero's opinion because he found Dr. Caballero's assessment was inconsistent with his own treatment notes and with the record as a whole, the assessment was based primarily on the Plaintiff's subjective

11

symptoms, and the assessment was devoid of any explanation, rationale, clinical findings, or reference to objective testing (Tr. 20).

*1. Dr. Caballero's opinion is not consistent with his own treatment notes.*

In the opinion letter dated February 3, 2009, Dr. Caballero noted Plaintiff had symptoms of axillary nerve damage and referenced EMG studies that "have repeatedly shown severe left axillary nerve injury" (Tr. 462). In his treatment notes from August 29, 2007 through January 7, 2008, Dr. Caballero routinely used a checklist to describe Plaintiff's physical condition (Tr 443-61). Throughout the treatment period, Dr. Caballero found, *inter alia*, Plaintiff's appearance, extremities and neurological examinations were normal, but the musculoskeletal exam was abnormal. *Id.* Dr. Caballero routinely reported a limited ROM and tenderness to palpation of Plaintiff's left shoulder. *Id.* However, Dr. Caballero made no mention of nerve damage or any positive neurological examination on any of Plaintiff's treatment notes, despite having diagnosed frozen left shoulder and cervicalgia[9] in each of Plaintiff's thirteen visits. *See id.* Although he refers to EMG studies in the February 2009 opinion letter, Dr. Cabellero does not mention any EMG testing in his treatment notes. *Id.* Thus, the ALJ's finding that Dr. Caballero's opinion is not supported by his own treatment notes is supported by substantial evidence.

*2. Dr. Caballero's opinion is not consistent with the record as a whole.*

---

[9]Cervicalgia is defined as "discomfort or more intense forms of pain that are localized to the cervical region. This term generally refers to pain in the posterior or lateral regions of the neck." *See* On-line Medical Dictionary at http://www.online-medical-dictionary.org (Look Up "Cervicalgia") (last visited February 17, 2012).

Plaintiff was examined by Dr. Harper-Nimock at the request of the DDS on July 16, 2007 (Tr. 358). Dr. Harper-Nimock diagnosed degenerative joint disease, status post rotator cuff surgery of the left shoulder and obesity (Tr. 360). The neurologic exam, however, revealed no motor or sensory deficit, which is contrary to Dr. Caballero's opinion. *Id.*

Plaintiff was treated by Dr. Bahri from July 14, 2009 to September 29, 2009 (Tr. 483-88). Dr. Bahri performed a left shoulder arthroscopy on September 25, 2009 (Tr. 488). Dr. Bahri's note of July 14, 2009, shows a diagnosis of capsulitis adhesive of the left shoulder (frozen shoulder) and impingement syndrome of the left shoulder[10] (Tr. 486). He also noted tenderness and diminished sensation over the distal humerus region. *Id.* Post surgery, in a note dated September 29, 2009, Dr. Bahri found mild swelling of Plaintiff's left shoulder, but good movement of the left wrist and elbow. *Id.* He noted that surgical findings were discussed with the Plaintiff, but there is nothing containing those findings in the record. *Id.* While it appears that Dr. Bahri gave orders for the Plaintiff to attend physical therapy and follow up with him, no treatment notes after September 29, 2009 are included in the record. *Id.* In contrast to Dr. Caballero's opinion, Dr. Bahri made no observation in the record of nerve damage or any EMG testing.

Plaintiff attended physical therapy from May 17, 2005 through August 31, 2005 at

---

[10]Impingement syndrome of the shoulder is a synonym for "supraspinatus syndrome," which is defined as "pain on elevating arm and tenderness on deep pressure over the supraspinatus tendon; due to pressure of an injured or inflamed tendon or inflamed subacromial bursa coming into contact with the overlying acromial process when the arm is elevated over the shoulder level." *See* MediLexicon *at* http://www.medilexicon.com/medicaldictionary.php?t=88261 (last visited February 2, 2012).

the Center for Physical Therapy (Tr. 264-96). She underwent additional physical therapy from October 2, 2007 through November 2, 2007 at Brooks Rehabilitation (Tr. 415-35). In the notes from the Center for Physical Therapy, the only mention of axillary neuropathy is in the prescription from Dr. Kitay dated August 5, 2005 (Tr. 269).  There is no objective finding of nerve damage in any of the notes from Brooks Rehabilitation (Tr. 415-35). Further, while Dr. Caballero stated Plaintiff had "essentially no use of her left arm," physical therapy notes from both the Center for Physical Therapy and Brooks Rehabilitation show improvement in Plaintiff's ROM of the left shoulder and normal ROM in the left wrist and elbow (Tr. 264-96, 415-35).

The record shows Plaintiff underwent an EMG/NCV study on May 1, 2006, at Jacksonville Orthopaedic Institute. The study report indicated a severe left axillary nerve injury with no change from the prior studies (Tr. 311).  The March 7, 2008 EMG/NCV test reveals the "nerve conduction study was within normal limits [and the] EMG showed decreased recruitment but no denervation potentials" (Tr. 436).  No other EMG/NCV tests are in the record for the relevant period.

Confusingly, Dr. Caballero stated in his opinion letter that the March 7, 2008, NCV/EMG "confirmed nerve damage" (*see* Tr. 462), while the record demonstrates "normal limits" (Tr.436) . For the reasons stated herein, the Court finds the ALJ did not err in finding Dr. Caballero's opinion evidence is inconsistent with the record as a whole.

*3. Dr. Caballero's opinion is based primarily on Plaintiff's subjective symptoms.*

The ALJ found Dr. Caballero's opinion was based primarily on the claimant's subjective symptoms (Tr. 20).  The narrative opinion dated February 3, 2009 goes into

14

detail about Plaintiff's "symptoms of frozen left shoulder and axillary nerve damage" and "neurologic pain of severe burning and stabbing . . . in the left shoulder area with numbness and tingling in her left arm" (Tr. 462). He further discusses Plaintiff's fear of worsening symptoms with further surgical intervention. *Id.* Even in discussing her limitations, Dr. Caballero bases his opinion on Plaintiff's subjective complaints of aggravation of pain with activity and "chronic, unrelenting pain" (Tr. 462-463). In fact, of the two page, five paragraph opinion, only two sentences make any reference to objective testing or clinical findings (Tr. 462). Thus, the ALJ's finding that Dr. Caballero's opinion is primarily based on subjective complaints is supported by substantial evidence.

*4. Dr. Caballero's opinion letter contained reference to objective testing.*

The ALJ found Dr. Caballero's opinion was "devoid of any explanation, rationale, clinical findings, or reference to objecting testing" (Tr. 20). Upon review of the opinion letter, the Court finds reference to two EMG studies and an MRI during the relevant period (*see* Tr. 462). Therefore, the Court holds the ALJ's finding that Dr. Caballero's opinion was devoid of references to objective testing is not supported by substantial evidence.

*5. There is good cause for discounting Dr. Caballero's opinion evidence.*

In summary, the Court finds the ALJ had good cause to accord Dr. Caballero's opinion little weight. While the ALJ erred in finding no reference to objective testing in Dr. Caballero's opinion letter, this was harmless error that would not have changed the outcome of the weight determination in light of the other stated reasons, which meet the good cause standard of *Lewis v. Callahan*. *See Lewis*, 125 F.3d at 1440.

**B.  Failure to explicitly discuss the opinion of Dr. Kitay**

The Regulations are clear that all evidence submitted by a claimant in support of alleged disability will be considered by the ALJ.  *See* 20 C.F.R. §404.1512(a); *Hamlin v. Astrue*, No. 3:07-cv-507-J-TEM, 2008 WL 4371326 (M.D. Fla. Sept 19, 2008).  However, failure to explicitly state the weight afforded to a former treating doctor is not *per se* fatal to an ALJ's decision.  For example, the Eleventh Circuit found an ALJ did not err by failing to discuss the opinion of a treating doctor that predated the plaintiff's alleged onset of disability when the doctor's reports would not change the ALJ's decision.  *Arrington v. Social Security Administration*, 358 Fed. Appx. 89, 94 (11th Cir. 2009); *see also Parton v. Astrue*, No. 3:07-cv-63-J-TEM, 2008 WL 897094, *5-6 (M.D. Fla. Mar. 31, 2008) (finding harmless error where the ALJ failed to discuss a treating physician's opinion if giving controlling weight to the opinion would not have changed the outcome).  Additionally, in *Heston v. Commissioner of Social Security*, 245 F.3d 528 (6th Cir. 2001), the court found that the ALJ's failure to discuss a physician's opinion constituted harmless error where the ALJ had attributed limitations of the claimant that were consistent with the doctor's opinion.  *Id.* at 535-36.  Further, the Ninth Circuit held that the records from a doctor predating the period at issue are only relevant to the claimant's burden of proving his condition has worsened.  *Fair v. Bowen*, 885 F.2d 597, 600 (9th Cir. 1989).

Plaintiff treated with Dr. Kitay and his associate, Dr. Steinberg, from July 7, 2005 until August 24, 2006, prior to the alleged onset date (Tr. 297-351).  During this time, Dr. Kitay diagnosed Plaintiff with a severe left axillary nerve injury and a history of left axillary neurolysis and left shoulder manipulation under anesthesia (Tr. 303).  On July 12, 2006

Dr. Kitay found that Plaintiff had reached maximum medical improvement with a PPI rating of twenty-three percent (23%) (Tr. 302).  He placed Plaintiff on permanent work restrictions of up to five pounds lifting on the left and no overhead lifting.  *Id.*

The ALJ limited Plaintiff to lifting a maximum of ten pounds, and found she should avoid overhead reaching and forward reaching with her left arm (Tr. 15).  While the ALJ determined Plaintiff retained a capacity to lift more weight overall, the rest of the ALJ's findings as to work limitations are equally or more restrictive than those shown in Dr. Kitay's opinion.  Additionally, the VE described several jobs that Plaintiff could perform based on the ALJ's restrictions:  Receptionist (Plaintiff's past relevant work), Addresser, Taper, Bonder (semi-conductor), Survey Worker,and Information Clerk (Tr. at 21).  None of these jobs exceed the exertional limitations of Dr. Kitay or the ALJ.[11]

Plaintiff is correct that the ALJ failed to explicitly discuss the records of a treating physician, Dr. Kitay, in his decision to deny benefits, and typically, that fact alone could be cause for remand.  However, it is plain from the record that the ALJ considered all the evidence in the record as required in the Eleventh Circuit.  *See Moncrief v. Astrue*, 300 Fed. Appx. 879, 882 (11th Cir. 2008) (holding the court should affirm the ALJ decision if the ALJ considered all the evidence in the record).  In this instance, the records from Dr. Kitay

---

[11] According to the Dictionary of Occupational Titles, Receptionist, Addresser, Taper, and Bonder are sedentary in nature, and require exerting up to ten pounds of force occasionally.  *See* U.S. Dep't of Labor, *Dictionary of Occupational Titles*, (4th ed. 1991), 237.367-038, 1991 WL 672192 (receptionist), 209.587-010, 1991 WL 671797 (addresser), 017.684-010, 1991 WL 646421 (taper), 726.685-066, 1991 WL 679631 (bonder-semiconductor).  Survey Worker and Information Clerk qualify as light work and require exerting up to twenty pounds of force occasionally and / or up to ten pounds of force frequently.  *See* U.S. Dep't of Labor, *Dictionary of Occupational Titles*, (4th ed. 1991) 205.367-054, 1991 WL 671725 (survey worker), 237.367-018, 1991 WL 672187 (information clerk).

are contained within exhibits 4F and 5F of the administrative record (Tr. 297-357). The ALJ's decision shows reference to, and discussion of, the information contained within these exhibits (*see* Tr. 16-17). Thus, ALJ Droker implicitly considered Dr. Kitay's opinion evidence when determining whether Plaintiff was disabled under the Social Security Act. Although it would have been preferable for the ALJ to have specifically discussed Dr. Kitay's opinion evidence, on the facts of this case, the Court does not find that his failure to do so subtracts from the substantial evidence in the case, and is therefore harmless error.

## C. The amended onset date of alleged disability

Plaintiff originally filed for DIB alleging a disability onset date of May 4, 2005 (Tr. 145-146). However, during the administrative hearing, Plaintiff's counsel suggested the alleged onset date be amended to March 1, 2007 to account for Plaintiff's earnings in 2006 and 2007 (Tr. 53). While the ALJ did not specifically rule on changing the date at that point, he remarked he would "make a note of that" and then used the amended date in his decision (Tr. 11, 53).

An "onset date should be set on the date when it is most reasonable to conclude from the evidence that the impairment was sufficiently severe to prevent the individual from engaging in [substantial gainful activity] for a continuous period of at least 12 months or result in death." *Keane v. Commissioner of Social Security*, 205 Fed. Appx. 748, 749 (quoting *Lewis v. Barnhart*, 285 F.3d 1329, 1330 (11th Cir. 2002). If Plaintiff's alleged onset date of disability was May 4, 2005, Dr. Kitay's records would directly fall within the relevant period.

However, if the onset date had not been changed to March 1, 2007, Plaintiff's's full-time work as a receptionist from May 2006 through March 2007 would have required a finding of "not disabled" at step one of the five-step evaluation. *See* C.F.R. § 404.1520(5)(b). "Under the regulations' earnings guidelines, a claimant's earnings (in 2001 and each year thereafter) ordinarily will show that [s]he engaged in substantial gainful activity if the earnings were more than the previous year or the average monthly earnings were more than $700, adjusted for changes in the national average wage index." *Culver v. Astrue*, No. 5:10cv249/RH/EMT, 2011 WL 7039940, *6 (N.D. Fla. Dec. 12, 2011) (quoting 20 C.F.R. § 416.947(b)(2)(I)). In 2006, the record shows Plaintiff earned an average monthly wage of $1624.75, which is well above the threshold set forth in the Regulations (Tr. 150, 153-54). Plaintiff worked for two months in 2007 and earned an average monthly wage of $1506. *Id.* Plaintiff's 2006 and 2007 earnings clearly constitute substantial gainful activity (SGA).

The ALJ gave Plaintiff the benefit of the doubt when he permitted Plaintiff to amend the alleged onset date to the last day she worked in 2007. Plaintiff cannot complain about the amended onset date; to do so would be fatal to her claim for DIB. The ALJ's factual finding regarding the date of onset of disability is supported by substantial evidence in the record. Plaintiff did not engage in SGA after March 1, 2007, whereas she was gainfully employed before that date.

## CONCLUSION

No principle of administrative law or common sense requires remand in quest of a perfect opinion unless there is reason to believe the remand might lead to a different result.

*Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989).  For the foregoing reasons, the undersigned finds the decision of the ALJ that Plaintiff is not disabled within the meaning of the Social Security Act is supported by substantial evidence.  In a more perfect decision, the ALJ would not have erroneously found Dr. Caballero's opinion was devoid of reference to objective testing, and the ALJ would have explicitly discussed Dr. Kitay's opinion evidence.  Both of these oversights are harmless errors because irrespective of these shortcomings, the decision to deny Plaintiff's claim DIB is supported by substantial evidence.

Accordingly, the Commissioner's decision is hereby **AFFIRMED** pursuant to sentence four of 42 U.S.C. § 405(g).  The Clerk of the Court is directed to enter judgment consistent with this Order and Opinion and, thereafter, to close the file.  Each party shall bear its own costs.

**DONE AND ORDERED** at Jacksonville, Florida this 17th day of February, 2012.

Copies to all counsel of record
  and *pro se* parties, if any

*Thomas E. Morris*
**THOMAS E. MORRIS**
United States Magistrate Judge